Jeffrey J. Hunt (5855)
David C. Reymann (8495)
Michael T. Hoppe (8790)
Michael D. Black (9132)
**PARR WADDOUPS BROWN GEE & LOVELESS**
185 South State Street, Suite 1300
Salt Lake City, UT 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

---

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

---

| | |
|---|---|
| USANA HEALTH SCIENCES, INC., a Utah Corporation;<br><br>Plaintiff,<br><br>v.<br><br>BARRY MINKOW, a California resident; and FRAUD DISCOVERY INSTITUTE, INC., a California Corporation,<br><br>Defendants. | **COMPLAINT**<br><br>**(Jury Trial Demanded)**<br><br>Case Number 2:07cv159<br><br>Judge Dale A. Kimball |

---

Plaintiff USANA Health Sciences, Inc. (USANA) complains against Defendants Barry Minkow and the Fraud Discovery Institute, Inc., as follows:

## I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff USANA Health Sciences, Inc., formerly known as USANA, INC. (USANA) is a Utah corporation, headquartered at 3838 West Parkway Boulevard, Salt Lake City, UT 84120.

2. Defendant Barry Minkow is a citizen of California, residing in southwest San Diego County. *See* http://en.wikipedia.org/wiki/Barry_Minkow. He is the founder and principal of the Fraud Discovery Institute, Inc.

3. Defendant Fraud Discovery Institute is a California corporation with its principal place of business 105 West F Street, Suite 304, San Diego, CA 92101.

4. Jurisdiction is proper under diversity jurisdiction, 28 U.S.C. § 1332(a), because USANA and Defendants are citizens of different states, and the amount in controversy exceeds $75,000.

5. Jurisdiction is proper over Defendants, pursuant to Utah Code Ann. § 78-27-24, *et seq.*, because each of these Defendants have transacted business within the State of Utah, contracted to supply services or goods in Utah, purposefully directed activities at Utah and/or at Utah resident(s), and/or caused injury within the State of Utah, and the claims alleged herein arise out of those contacts.

6. As more specifically detailed below, Defendants have directed their activities toward Utah by, *inter alia*, purchasing products from USANA, traveling to Utah to attend and record USANA's sales presentations, and authoring and publishing a Report specifically targeting USANA and calculated to defame USANA and lower its stock price, so as to allow Defendant Minkow to benefit from his short position in USANA's publicly-traded stock.

7. Venue is proper in this Court under 28 U.S.C. § 1391(a)(2) and (3), because a substantial part of the events giving rise to the claims herein occurred in Utah, and because Defendants are subject to personal jurisdiction in Utah due to their participation in these events.

## II. PRELIMINARY STATEMENT

8. After acknowledging taking short positions on USANA's publicly-traded stock, convicted felon and fraudster Barry Minkow has published a 95-page Report with 400 pages of addenda on the website of the Fraud Discovery Institute. The Report is full of conclusions that purport to be supported by scientific laboratory testing and various experts in direct marketing. The Report misrepresents numerous laboratory reports of USANA's products, and is riddled with exaggerations, half-truths, and plainly false statements regarding USANA's business model. These false statements are designed not only to devastate USANA as an entity, its products and all of its distributors; but also to line Mr. Minkow's own pockets through a strategy that is the opposite of the classic pump-and-dump: here a "distort and short."

## III. FACTUAL BACKGROUND

9. USANA is one of America's leading companies in the field of health and nutrition. USANA has achieved its pre-eminent position by a line of superior and trustworthy products, and its innovative network marketing program. USANA manufactures high quality nutritional and personal care products that are sold directly to USANA's Preferred Customers and Associates throughout the United States, Canada, Australia, New Zealand, Hong Kong, Japan, Taiwan, South Korea, Singapore, Malaysia, Mexico and the United Kingdom. USANA's products are on the leading edge of providing adequate cell-level nutrition, fiber, and antioxidant protection.

10. USANA's founder, chairman and CEO, Dr. Myron Wentz, is a world-renowned pioneer in cell-culture technology. USANA's president and manager of day-to-day operations is Dr. Wentz's son, David Wentz.

11. USANA is a publicly traded corporation.

12. Defendant Minkow is a fraudster and convicted felon. Minkow trumpets his past crimes on the website of his business, www.frauddiscovery.net. Minkow's website biography, and report on USANA, which underlies this action, repeatedly acknowledge Minkow's criminal past, including his conviction for securities fraud, seven-year sentence, and continuing obligation to pay a $26 million restitution judgment.

13. On February 20, 2007, Minkow, on behalf of himself and the Fraud Discovery Institute, prepared and sent a report on USANA to officials at the SEC, FBI and IRS (the Report). A copy of the massive Report, with its numerous addenda, is attached as **Exhibit 1**.

14. Minkow also sent a copy of the Report to the Wall Street Journal on or about February 20, 2007.

15. In a cover letter to the report, dated February 21, 2007, Minkow revealed that he had taken short positions on USANA's stock, and intended to make money thereby. **Exhibit 2**, 2/21/07 letter.

16. On March 15, 2007, Minkow, on behalf of himself and the Fraud Discovery Institute, published the Report on the Institute's website, www.frauddiscovery.net/usana.html.

17. Minkow accompanied his March 15, 2007 general publication of the Report with a Press Release, www.frauddiscovery.net/usanapr.html, attached as **Exhibit 3**.

18. The acknowledged purpose of the Report and Press Release are to injure USANA.

19. The Report seeks to defame and damage USANA by, *inter alia*, persuading the public not to purchase USANA products or avail themselves of USANA's business

opportunities; by persuading federal authorities from the SEC, FBI, and IRS to investigate USANA, and by causing USANA's publicly traded stock to tumble in price.

20. The Report contains numerous false and defamatory statements of fact.

**A. False Statements Regarding USANA Products**

21. In order to support its core contention that USANA has no real retail business because its products are overpriced, the Report purports to have tested USANA's products against comparable retail products in order to compare product quality and potency; and that this testing is necessary to eliminate the contention that USANA charges more for its products because they are better or more potent than comparable retail products. *See* Report, **Exhibit 1**, text at notes 29-30 (the Report does not contain page numbers).

**1. TENX bar antioxidant comparison**

22. The Report states:

> [B]ased on our independent lab reports, the Usana Health Sciences, Inc. products appear to fail the competitively priced component of this model as evidenced by their Health Pak 100TM twice daily Multi Vitamin Pak (pack), the company's Chelated Minerals product and the company's new TENX antioxidant bar.
>
> * * *
>
> To arrive at what constitutes "comparable benefit and potency" the Fraud Discovery Institute allowed two labs to determine which product best compared to the Usana product. In one instance of testing Usana's new TENX Blast bar that claims to be "10 times the antioxidant power of any juice products currently on the market," we allowed the lab to choose what product it should be tested against. The lab subsequently chose Langers Grape Juice Plus to determine if the Usana product was, in fact "10 times stronger than any juice." The test results showed TENX is just over 2 times stronger than 8 ounces of grape juice—nowhere near 10 times stronger.

**Exhibit 1**, Report, text at n.29 and in n.30. *See* also *id.*, text at n.57.

23. The Report's assertion that USANA's TENX bar is just over 2 times stronger than 8 ounces of grape juice is false.

24. The USANA claim that Minkow purports to disprove through lab testing is that its TENX bar has "10 times the antioxidant power of any juice products currently on the market."

25. The Report compares the antioxidants in a 2 ounce TENX bar with the antioxidants in 8 ounces of Langers Grape Juice Plus, concluding that the bar is "just over 2 times stronger." **Exhibit 1**, Report, n.30. *Id.*

26. The lab report that Minkow relies upon specifically finds that a 40 gram TENX bar contains 384 antioxidant units per gram, whereas the 8 ounces of Langers Grape Juice contains 23.2 antioxidant units per gram – a ratio that substantiates USANA's claim that its product is 10 times stronger: the TENX bar in fact has 16.5 times as much antioxidant as the Grape Juice, when compared gram-for-gram. **Exhibit 1**, Report, Addendum 5, last page.

27. Instead of comparing the products gram-for-gram, Minkow uses the lab report's comparison of antioxidant units "per serving." The lab report does not define what constitutes a serving of each product, but the lab's idea of a serving of the Grape Juice is about 6.3 times as massive as a serving of the TENX bar, because on a "per serving" basis the TENX bar has 15,360 antioxidant units, whereas the Langers Grape Juice contains 5,861 antioxidant units – a ratio 2.6 – a number that Minkow further mischaracterizes as "just over 2." *Id.*

28. The Report repeats this false comparison, asserting that "It would take 20.8 ounces of grape juice to equal the (ORAC) Oxygen Radical Absorption Capacity in one TENX

bar." **Exhibit 1**, Report, text at n. 58. It would actually take 6.5 times as much grape juice as Minkow claims to match the antioxidant levels in one TENX bar.

29. The Report then compares the cost of antioxidants from the two sources based on this false premise by comparing the cost of the two products, concluding that the USANA TENX bar is "**148% more expensive** than the Langers Grape Juice" as a source of antioxidants. *Id.* (emphasis in original). This emphasized conclusion is false; the TENX bar is actually a far less expensive source of antioxidants.

30. These false statements are substantial and material because the Report's conclusions regarding the viability of USANA's business model are premised in large part on the contention that USANA's products are no better than other available retail products, and are grossly overpriced.

**2. Health Pak 100 N-Acetyl L-Cystine comparison**

31. The Report states:

> Another independent laboratory tested 38 of the listed vitamins and minerals in the Usana Health Pak 100™. The lab found that only four of the 38 ingredients were lower (or in the case of N-Acetyl L-Cysteine [sic] - none existed at all) than the potency promised on the box.

Report, text at n. 33.

32. Minkow repeats this assertion elsewhere in the Report. *See id.*, text at n. 103.

33. The lab report relied upon by the Report does not state that no N-Acetyl L-Cystine exists in its tested sample. Rather, the lab report states that N-Acetyl L-Cystine was "Not Detected." Report, Addendum 5 at p. 11.

34. USANA contacted the lab that performed this testing and was told that the lab was unable to detect any quantity of N-Acetyl L-Cystine using its own equipment. The lab

reported that it actually spiked a sample of the Health Pak 100 with N-Acetyl L-Cystine in order to determine the ability of its equipment to detect this compound, and even the spiked sample revealed no detectable amount. Thus, the lab's statement that no N-Acetyl L-Cystine was detected in its sample is materially different from the Report's assertion that none exists in the sample.

**3. Grape seed extract**

35. The Report states that USANA's Health Pak 100 product:

> Grape Seed Ext. claimed 45 mgs per serving and only tested for 13.3 mgs per serving.

**Exhibit 1**, Report, text at n. 33.

36. The lab report on which this assertion is based states that Health Pak 100 claims to have 45 mg of grape seed extract, but tests for 13.3 mg of proanthcyanidins. *Id.* at Addendum 5, p. 11.

37. USANA contacted the lab regarding this report. The lab explained that it did not test the vitamin sample for its amount of grape seed extract, but tested for a component of grape seed extract: proanthcyanidins. The amount of proanthcyanidins found in the sample (13.3 mg) is the amount that would be expected in 45 mg of grape seed extract.

38. Minkow's assertion that the sample contained only 13.3 instead of 45 mg of grape seed extract is therefore false, and not supported by or justified by the lab report.

**B. <u>Different statements to SEC and FTC</u>**

39. The Report asserts that USANA's officer Dave Wentz tells one story to the FTC regarding USANA's viability in light of the FTC's proposed rule changes for multi-level marketing companies, but Dave Wentz tells a completely different story to the SEC when under

oath, and subject to the disclosure requirements of the Sarbanes-Oxley act. **Exhibit 1**, Report, text at notes 70-74.

40. The Report quotes a letter from "Mr. Dave Wentz, the current President and Chief Executive Officer of Usana Health Sciences, Inc." to the FTC, in which Dave Wentz stated that the FTC's proposed "Rule goes too far in trying to protect the public by proposing certain unnecessary and burdensome requirements that will make it very difficult, if not impossible, for Usana and our independent distributors to continue growing our respective businesses." *Id.*, text at n. 70.

41. The Report then asserts that the same Mr. Wentz told a completely different story to the SEC, in his sworn 10-Q report:

> Mr. Wentz told the SEC and stockholders (or more importantly what he did not tell the SEC and stockholders) about this proposed FTC rule and its modest, potential impact on Usana in the latest 10-Q. . . . . "If the proposed rule were adopted as currently proposed, it might require USANA to change some of its current practices regarding pre-sale disclosures."

*Id.*, text at n. 73.

42. Mr. Minkow then contrasts the two reports by Dave Wentz:

> What? Change some of its current practices regarding pre-sale disclosures? He told the FTC that it may be impossible for the company to ever grow again and questioned its ability to survive if these new proposed rules take effect, but then he tells the SEC the company may have to make a slight policy change. Mr. Wentz simply cannot have it both ways, especially if one those "ways" is under oath.

*Id.*, text at n. 73. The clear implication of this statement is that Dave Wentz is either lying to the FTC or to the SEC, and if lying to the SEC is doing so under oath.

43. Minkow makes this implication explicit later in the Report:

> Still not convinced? Consider Usana's CEO, who writes one letter to the FTC, claiming that new rules forcing the company to disclose collapse and attrition rates would make it almost "impossible" for his company to succeed. Yet 30 days later, this same executive signs a 10-Q under the penalty of perjury and states just the opposite.

*Id.*, text after fn. 174 (emphasis added).

44. Minkow's report errs in its attribution of the statements. The statement to the FTC was made by USANA president David Wentz. The SEC 10-Q report was made, and signed under oath by USANA CEO and Chairman Dr. Myron Wentz.

45. The identities of the two Wentzes, and their respective roles at USANA, are detailed on USANA's website http://www.usana.com/dotCom/company/management/index.jsp, and Minkow's Report demonstrates his intimate familiarity with USANA's management. *See* Report, *passim*.

46. Minkow's false attribution of reports is not a negligent error but a deliberate conflation designed to support an assertion that USANA's management has lied in its SEC 10-Q report and violated Sarbanes Oxley.

47. Minkow's false and defamatory assertions about the Wentzes, as principals of USANA, were intended to and have caused injury to USANA.

## C. Assertions Regarding USANA's Business Model

48. Minkow's report also contains numerous false statements regarding USANA's business model. Defendants communicated these falsehoods with intent to defame USANA and drive its stock price down. These statements include:

- "virtually all the purchasers of [USANA's] products are business incentivized distributors", **Exhibit 1**, Report, text at n. 50;
- "almost no retail market for Usana's products appears to exist", *Id.*, text at n. 67;

- "Usana has been sustaining annual revenue by expanding into new recruiting territories and has no sustainable sales force or customer base other than the distributors who have hopes of building businesses." *Id.*, text at n. 81;
- "[W]ith no stable retail clients and huge attrition and collapse rates, the only way for Usana to grow is to find new territories until they too become saturated. It just appears to give the investors, the analysts, and the distributors half the story." *Id.* text at n. 94;
- At USANA "No systems are put in place, however, to monitor retail sales or enforce the requirements." *Id*., text at n. 116;
- "Usana has no method for monitoring this blanket requirement of retail sales and no systematic program of enforcing the rule. Without such methods or programs and considering all other factors that incline the business toward endless chain recruiting, the policy statements are worth nothing." *Id.*, text at n. 132.

49. Defendants made all of the above statements regarding lab results, SEC reports, and USANA's business model, with knowledge that they were false, or reckless disregard to whether they were true or false; and Defendants knew or should have known of the falsity of their statements.

50. On March 15, 2007, the day that Defendants released the Report to the public with the Press Release, and the Wall Street Journal wrote an article on it, USANA's stock decreased over 13%.

## IV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF - DEFAMATION

51. USANA incorporates all prior paragraphs as though fully set forth.

52. By publishing the Report, and the Press Release summarizing and drawing attention to the Report, Defendants Minkow and the Fraud Discovery Institute have defamed USANA.

53. Numerous statements in the Report, including those set forth above, are false.

54. These statements in the Report are calculated to deter the public generally from dealing with USANA, *i.e.* from buying its products or availing themselves of its business opportunities.

55. These statements were published with negligence and/or with knowledge of their falsity, or with reckless disregard as to whether they were true or not.

56. Defendants knew or should have known that the statements were false when made.

57. These statements are not subject to any privilege.

58. Defendants were motivated to publish these statements out of desire to do harm to USANA.

59. These statements have damaged USANA, *inter alia*, by prejudicing and discrediting USANA in the estimation of the community and USANA's present and potential customers, distributors, investors, vendors, and others doing business with USANA; and by harming USANA in the conduct of its business; and by deterring others from associating or dealing with USANA, causing it to lose goodwill and present and potential distributors and customers.

60. The damage to USANA is evidenced by a 13% decrease in the price of its publicly traded stock on the day the Report was released.

61. As a result of Defendants' defamation, USANA is entitled to an award of general and special damages in an amount to be proven at trial.

62. In addition, Defendants have engaged in willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of USANA.

63. As a result of such conduct, USANA is entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorneys' fees incurred in these proceedings by USANA.

**SECOND CLAIM FOR RELIEF – BUSINESS DISPARAGEMENT**

64. USANA incorporates all prior paragraphs as though fully set forth.

65. The defamatory statements set forth herein and published by Defendants are false, are harmful to the business interests of USANA, and have subjected USANA to pecuniary loss.

66. Defendants published the defamatory statements with intent to cause USANA harm and pecuniary loss and/or recognized or should have recognized that such harm and pecuniary loss would occur.

67. Defendants published the defamatory statements knowing that such statements were false or in reckless disregard for the truth or falsity of such statements.

68. As a result of the publication of the defamatory statements and disparagement of USANA, its products, its business opportunity, its business model, and its services, USANA has suffered or anticipates that it will suffer damages in the form of lost sales, diminished goodwill, and other damages in an amount to be proven at trial.

69. In addition, the foregoing conduct of Defendants is the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of USANA.

70. As a result of such conduct, USANA is entitled to an award of exemplary and punitive damages against Defendants and all costs, expenses, and attorneys' fees incurred in these proceedings by USANA.

WHEREFORE, Plaintiff USANA demands judgment against Defendants Minkow and the Fraud Discovery Institute, Inc. as follows:

- For damages, including actual, compensatory, general, special, punitive, exemplary, and/or statutory damages as may be appropriate and as alleged herein, together with all applicable pre-judgment and post-judgment interest thereon;
- For recovery of reasonable attorneys' fees and costs incurred in connection with this action; and
- For such other and further relief as the Court may deem appropriate.

**JURY DEMAND**

USANA hereby demands a jury on all issues and claims triable thereto.

DATED this 15th day of March 2007.

**PARR WADDOUPS BROWN GEE & LOVELESS**

By: /s/ Jeffrey J. Hunt
Jeffrey J. Hunt
David C. Reymann
Michael T. Hoppe
Michael D. Black

Attorneys for USANA

**Plaintiff's Address:**
3838 West Parkway Boulevard
Salt Lake City, UT 84120